IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY | § | |
| | § | |
| *Petitioner,* | § | |
| | § | |
| v. | § | Civil Action No. SA-17-CV-270-XR |
| | § | |
| THE AMERICAN RAILWAY & AIRWAY | § | |
| SUPERVISORS' ASSOCIATION, A | § | |
| DIVISION OF THE TRANSPORTION | § | |
| COMMUNICATIONS UNION/IAM and | § | |
| ROLAND BELTRAN, | § | |
| | § | |
| *Respondents.* | § | |

## ORDER

Petitioner Union Pacific Railroad Company ("Union Pacific") filed this action to review and set aside an arbitration award under the Railway Labor Act, and Respondents[1] have counterclaimed to enforce the arbitration award. After careful consideration of the parties' cross-motions for summary judgment (docket nos. 19 & 21), the Court will VACATE the order of the Board.

## Background

The underlying facts are undisputed. Roland Beltran worked as a Carman for Union Pacific. His position required him to hold a commercial driver's license, making him subject to drug and alcohol testing under regulations issued by the Department of Transportation ("DOT") and the Federal Motor Carrier Safety Administration ("FMCSA"). Beltran tested positive for cocaine on December 23, 2010, after which he signed a Waiver/Agreement Letter in January

---

[1] Respondents are Roland Beltran and his union, the American Railway & Airway Supervisors' Association, a Division of the Transportation Communications Union/IAM. They will be referred to collectively as "Beltran."

2011 allowing him to continue working contingent upon completing an Employee Assistance Plan ("EAP") and remaining drug free (confirmed by random drug testing). R. 117. In the Waiver/Agreement Letter, Beltran admitted that he intentionally used and tested positive for cocaine, accepted dismissal in connection with the charges, and stated that he wished to avail himself of a one-time return-to-service opportunity as provided in the UPRR Drug & Alcohol Policy (Article 21) and the controlling Companion Agreement. R. 117.[2]

The UPRR Drug & Alcohol Policy Article 21.1.2 provides that "[a]n employee who has been granted a one-time return to service under this provision and who violates the Union Pacific Drug & Alcohol Policy again within a ten (10) year period will be dismissed permanently." R. 170. The Waiver/Agreement Letter also noted that, if Beltran disputed a non-negative drug test result, he could request a post-suspension hearing under 49 C.F.R. § 291.104.[3]

Beltran tested positive for methamphetamine and amphetamine on November 20, 2014. Dr. Barnett, the Medical Review Officer ("MRO"), verified the positive result to Union Pacific on November 25, 2014 in a "Medical Review Officer Final Report" that stated that the test was conducted in accordance with 49 C.F.R. Part 40 and Part 382. R. 128. The UPRR Drug & Alcohol Policy provides that all drug tests required by DOT or Union Pacific will be performed

---

[2] The Prevention Program Companion Agreement is an agreement between the Carrier and the Union that permits an employee who has been dismissed from service as a result of violating Rule G (governing drug use) to participate in the Rule G Rehabilitation/Education Program, provided the employee has had no Rule G offense on his or her record for at least ten years, has not participated in the Rule G R/E Program for at least ten years, and the incident giving rise to the dismissal did not involve significant rule violations other than Rule G. R. 42-44. The employee's agreement to utilize this program is referred to as a "Waiver/Agreement Letter" or sometimes also as a "Companion Agreement."

[3] That regulation requires a regulated employee to be removed from regulated service if he violates § 219.102, which provides that "[n]o regulated employee may use a controlled substance at any time, whether on or off duty," except as prescribed by a medical practitioner, and controlled substances includes stimulants such as cocaine and amphetamines. If a regulated employee denies that a test result or other information is valid evidence of a violation of § 219.102, the employee "may demand and must be provided an opportunity for a prompt post-suspension hearing before a presiding officer other than the charging official." 49 C.F.R. § 219.104(c)(1). The hearing may be one conforming to the requirements of an applicable collective bargaining agreement ("CBA") and 49 U.S.C. § 153. 49 C.F.R. § 219.104(c)(3).

in accordance with the specimen collection and laboratory analysis procedures in 49 C.F.R. Part 40. It also contains a section on "MRO Review" that aligns with 49 C.F.R. Part 40, though it does not include all of the provisions in Part 40. It provides that every drug test result reported by the laboratory will be reviewed by a qualified MRO and, in each case, prior to making a final decision to verify a positive test result reported by the laboratory, the MRO will make a reasonable effort to contact the employee tested and give them an opportunity to discuss the result. R. 158. "If after successfully contacting the employee, the MRO determines that there is a legitimate medical explanation for the positive test result, the MRO will report the test result as negative." *Id.* "If the MRO verifies the test result as positive, the MRO will instruct the employee not to report to, or perform any service. The MRO will report the result to the Union Pacific [Designated Employer Representative] for administrative action." *Id.*

The governing regulations, which are incorporated into the UPRR Drug & Alcohol Policy,[4] provide detailed, specific guidelines and instructions for the verification process by the MRO. MROs are physicians who act as independent and impartial gatekeepers and advocate for the accuracy and integrity of the drug testing process, including providing a quality assurance review of the drug testing process for specimens and "determin[ing] whether there is a legitimate medical explanation for confirmed positive . . . drug tests results from the laboratory." 49 C.F.R. § 40.123. In § 40.123(c) governing the MRO's responsibilities, they state that the MRO "must determine whether there is a legitimate medical explanation for confirmed positive, adulterated, substituted, and invalid drug tests results from the laboratory." In § 40.129(a)(4), they direct the MRO to "conduct a verification interview" that "must include direct contact in person or by

---

[4] The Union Pacific Drug & Alcohol Policy states that nothing in the policy supersedes federal regulations and notes the applicability of 29 C.F.R. Part 40. R. 132. Beltran agrees that the UPRR Drug & Alcohol Policy incorporates 29 C.F.R. Part 40. Docket no. 21-1 at 16.

telephone" with the employee. *See also* 49 C.F.R. § 40.131(a) ("When, as the MRO, you receive a confirmed positive, adulterated, substituted, or invalid test result from the laboratory, you must contact the employee directly (*i.e.*, actually talk to the employee), on a confidential basis, to determine whether the employee wants to discuss the test result.").

Relevant here, the regulations further direct what the MRO must tell the employee at the beginning of the verification interview: (a) that the laboratory has determined that the employee's test result was positive, and the drugs for which his or her specimen tested positive; (b) explain the verification interview process to the employee and inform the employee that the MRO's decision will be based on information the employee provides in the interview; (c) explain that, if further medical evaluation is needed for the verification process, the employee must comply with the MRO's request for this evaluation and that failure to do so is equivalent of expressly declining to discuss the test result; and (d) warn an employee who has a confirmed positive test that the MRO is required to provide to third parties drug test result information and medical information[5] affecting the performance of safety-sensitive duties that the employee gives the MRO in the verification process without the employee's consent. 49 C.F.R. § 40.135.

Section 40.137 addresses "On what basis does the MRO verify test results involving marijuana, cocaine, amphetamines, semi-synthetic opioids, or PCP?" and states:

> (a) As the MRO, you must verify a confirmed positive test result for marijuana, cocaine, amphetamines, semi-synthetic opioids (i.e., hydrocodone, hydromorphone, oxycodone, and oxymorphone), and/or PCP unless the employee presents a legitimate medical explanation for the presence of the drug(s)/metabolite(s) in his or her system. In determining whether an employee's legally valid prescription consistent with the Controlled Substances Act for a substance in these categories constitutes a legitimate medical explanation, you

---

[5] For purposes of paragraph (d), medical information includes information on medications or other substances affecting the performance of safety-sensitive duties that the employee reports using or medical conditions the employee reports having. 49 C.F.R. § 40.135(d)(2).

must not question whether the prescribing physician should have prescribed the substance.

(b) You must offer the employee an opportunity to present a legitimate medical explanation in all cases.

(c) The employee has the burden of proof that a legitimate medical explanation exists. The employee must present information meeting this burden at the time of the verification interview. As the MRO, you have discretion to extend the time available to the employee for this purpose for up to five days before verifying the test result, if you determine that there is a reasonable basis to believe that the employee will be able to produce relevant evidence concerning a legitimate medical explanation within that time.

(d) If you determine that there is a legitimate medical explanation, you must verify the test result as negative. Otherwise, you must verify the test result as positive.[6]

Section § 40.141, entitled "How does the MRO obtain information for the verification decision?" provides,

As the MRO, you must do the following as you make the determinations needed for a verification decision:

(a) You must conduct a medical interview. You must review the employee's medical history and any other relevant biomedical factors presented to you by the employee. You may direct the employee to undergo further medical evaluation by you or another physician.

(b) If the employee asserts that the presence of a drug or drug metabolite in his or her specimen results from taking prescription medication (i.e., a legally valid prescription consistent with the Controlled Substances Act), you must review and take all reasonable and necessary steps to verify the authenticity of all medical records the employee provides. You may contact the employee's

---

[6] DOT commentary on the final rule states, "One of the important provisions of this section, which the final rule makes explicit, is that employees bear the burden of proof that there is a legitimate medical explanation for the presence of these drugs in their specimens. One commenter asked that we not 'shift' the burden of proof to the employee. There is no 'shift.' The employee has always had this responsibility. Consistent with similar provisions in the validity testing context, we are requiring employees to present their explanation and supporting evidence at the time of the verification interview. The MRO's staff will already have told the employee to gather prescription and other relevant information for this purpose. This should help to expedite the verification process. However, if the employee persuades the MRO that there is a reasonable basis to believe that the employee can produce additional relevant evidence, the MRO can grant up to five additional days to produce the evidence. This is not mandatory: The MRO should grant more time only if it appears that there is a good reason to do so." 65 Fed. Reg. 79462-01, 79497.

physician or other relevant medical personnel for further information. You may request an HHS–certified laboratory with validated protocols (see § 40.81(c)) to conduct testing for D,L stereoisomers of amphetamine and methamphetamine or testing for tetrahydrocannabivarin (THC- V) when verifying lab results, as you determine necessary.

The evidence is undisputed that Dr. Barnett, the MRO, contacted Beltran to discuss the positive result, that they discussed the result, and that Dr. Barnett thereafter verified the test result as positive.[7]

The focus of this petition is 49 C.F.R. § 40.149, which is entitled "May the MRO change a verified drug test result?" and mandates that only the MRO may change a verified positive test result and under what circumstances. That section provides:

(a) As the MRO, you may change a verified test result only in the following situations:

(1) When you have reopened a verification that was done without an interview with an employee (see § 40.133(d)).

(2) If you receive information, not available to you at the time of the original verification, demonstrating that the laboratory made an error in identifying (e.g., a paperwork mistake) or testing (e.g., a false positive or negative) the employee's primary or split specimen. For example, suppose the laboratory originally reported a positive test result for Employee X and a negative result for Employee Y. You verified the test results as reported to you. Then the laboratory notifies you that it mixed up the two test results, and X was really negative and Y was really positive. You would change X's test result from positive to negative and contact Y to conduct a verification interview.

(3) If, within 60 days of the original verification decision—
(i) You receive information that could not reasonably have been provided to you at the time of the decision demonstrating that there is a legitimate medical explanation for the presence of drug(s)/metabolite(s) in the employee's specimen;
(ii) You receive credible new or additional evidence that a legitimate medical explanation for an adulterated or substituted result exists.

---

[7] Dr. Barnett was also required to inform Beltran of his right to request testing of a split specimen, and Beltran requested a test of the split specimen. Each test specimen is divided into two split specimens and only one is initially tested. If the employee requests that the split specimen be tested, the remaining split specimen is tested by a different lab. Dr. Barnett confirmed that it also tested positive for amphetamine and methamphetamine on December 11. R. 125-27.

Example to Paragraph (a)(3): If the employee's physician provides you a valid prescription that he or she failed to find at the time of the original verification, you may change the test result from positive to negative if you conclude that the prescription provides a legitimate medical explanation for the drug(s)/metabolite(s) in the employee's specimen.

(4) If you receive the information in paragraph (a)(3) of this section after the 60–day period, you must consult with ODAPC prior to changing the result.

(5) When you have made an administrative error and reported an incorrect result.

(c) You are the only person permitted to change a verified test result, such as a verified positive test result or a determination that an individual has refused to test because of adulteration or substitution. This is because, as the MRO, you have the sole authority under this part to make medical determinations leading to a verified test (e.g., a determination that there was or was not a legitimate medical explanation for a laboratory test result). For example, *an arbitrator is not permitted to overturn the medical judgment of the MRO that the employee failed to present a legitimate medical explanation for a positive, adulterated, or substituted test result of his or her specimen.*

49 C.F.R. § 40.149(c) (emphasis added).[8]

Union Pacific issued a notice of investigation on December 3, 2014, which notified Beltran that he "allegedly tested positive for a prohibited substance (Amphetamines, Methamphetamines) in a FMCSA Follow-up Test" administered in accordance with the UPRR Drug & Alcohol Policy. R. 115. The notice further stated, "If proven, this would be in violation of the UPRR Drug and Alcohol Policy and General Code of Operating Rules (Rule 1.5)"[9] and the proposed discipline would be Level 5 (termination). R. 115.

UPRR conducted an investigation hearing on January 7, 2015 pursuant to the applicable CBA. R. 49. The UPRR Director of Road Operations presented evidence on Union Pacific's

---

[8] Similarly, 49 C.F.R. § 40.167(e) provides, "MRO reports are not subject to modification or change by anyone other than the MRO, as provided in § 40.149(c)." The Court notes that there have been some amendments to the various applicable regulations during the pendency of this case here, but they do not materially affect the Court's analysis.

[9] Rule 1.5 provides, "Employees must not have any prohibited substances in their bodily fluids when reporting for duty, while on duty, or while on company property." R. 73.

behalf concerning the drug testing and "how the drug and alcohol evidence, rules and polices and regulations apply to the charges." R. 58. He testified about some of the regulatory guidelines that applied, including verification by the MRO (but not § 40.149), and testified that the guidelines were followed. R. 59. He asserted that the evidence showed that Beltran violated the UPRR Drug & Alcohol Policy, Rule 1.5, and the Waiver/Agreement Letter. R. 76-77.

Beltran was represented by counsel and was permitted to submit evidence. Beltran testified and denied using amphetamine or methamphetamine. R. 80. He stated that he was "in disbelief" about the positive test result because he had not done such a drug. R. 81. Beltran testified that Dr. Barnett called him to tell him about the positive test result and asked what prescribed medications he was taking, but said he did not need to know about his over-the-counter medications for the flu. R. 101. He testified that he regularly took several prescription drugs, including Phentermine, and had been experiencing cold or flu-like symptoms and had taken over-the-counter medications, including a Vick's inhaler, on November 17, 18, and 19 (the test was November 20). R. 82-83, 90. He provided prescription information about Phentermine stating that it "is structurally similar to amphetamine" as well as an internet printout that the active ingredient in Vick's inhaler, pseudoephedrine, could give a false positive for amphetamines and methamphetamines. R. 82-84.

Beltran also provided a letter from Dr. Zeitlin, a medical doctor but not his treating physician, stating that in his medical opinion the test results appeared to be false positives and that Beltran should be re-tested. R. 187. Dr. Zeitlin's letter listed Phentermine as being structurally similar to amphetamine, and noted that NyQuil D includes pseudoephedrine and that NeilMed inhaler contains the L-enantiomer form of methamphetamine. R. 86-87. Dr. Zeitlin stated that an "extensive medication history including prescription medication, herbal medication

and over-the-counter medication should be obtained from the subject" to "anticipate false positives" and that neither immunoassay or GC-MS testing can differentiate between L and D isomers. R. 87.

Dr. Barnett appeared as a witness. He testified that he "asked [Beltran] what medications he was taking" and "documented them." He also noted the "additional medications listed in this letter [from Dr. Zeitlin,]" but stated that "[n]one of those would cause a positive though for amphetamine or methamphetamine." R. 107. He continued, "[W]e rely on the lab for accuracy. They do a screening test and a confirmatory test. Both were positive. They also did an isomer test, which came up at 72.3% D-methamphetamine." R. 107. Therefore, based on Dr. Barnett's experience, he testified Beltran tested positive for amphetamine and methamphetamine. R. 107. He noted that the initial screening test used immunoassay and the confirmation test used a gas chromatograph. R. 107.

Dr. Barnett was also questioned by the hearing officer, and Dr. Barnett stated that none of Beltran's prescription medications, including Phentermine, would cause the positive result. R. 108-109. He also stated that the Vick's inhaler could give a positive result for the L isomer, but Beltran's test was positive for the D isomer at 72.3%, "so Vick's inhaler wouldn't account for this methamphetamine result." R. 109.

In his closing statement, Beltran argued that "the over-the-counter medication and prescribed combination have resulted in this" and that the testing was inadequate. R. 112. The hearing officer found Beltran guilty, and Union Pacific then terminated his employment. The Union appealed the dismissal, and the claim was denied.

The Union progressed the claim in accordance with the procedures set forth in the Railway Labor Act and provisions of the CBA, and the Union then notified Union Pacific that it

would take the matter to arbitration. The claim was arbitrated before Public Law Board 5514. Beltran argued that the test was a false positive and that Union Pacific should have conducted another test that would have exonerated Beltran, as recommended by Beltran's medical expert. Beltran also noted that he had 57 prior negative test results. Union Pacific argued that the test was not a false positive, that appropriate testing had been done, and that termination was appropriate and required.

The Board reviewed the medical and testimonial evidence and sustained in part Beltran's claim on December 22, 2016. The Board's order notes that "it is an employee's clear responsibility to alert the testing personnel of any and all medications he or she may be taking" and "[t]here can be no argument that Claimant's own failure to mention the doctor-supervised medications he was taking contributed to his failure on the November 20, 2014 drug test" though he should have been aware of the requirement based on his past drug testing. R. 3. The Board reinstated Beltran, without back pay, but with seniority and other benefits intact, and with the conditions that he re-enter and complete the EAP program before he returned to work, and that he be subject to random drug testing and remain drug free for 72 months.

The Carrier member of the Board dissented, noting that Dr. Barnett had refuted Beltran's argument that it was a false positive, emphasizing Dr. Barnett's testimony that the Vick's inhaler could account for an L-isomer methamphetamine result, but not for Beltran's D-isomer methamphetamine result. Thus, the Carrier member felt that the Board had ignored the evidence that the Vick's inhaler could not account for the positive result, and that the terms of the Companion Agreement were clear and unambiguous that a positive drug test would result in dismissal.

Union Pacific refused to return Beltran to work and filed this petition seeking review of the arbitration decision under 45 U.S.C. § 153, which provides that district courts may review an arbitration decision in certain circumstances.[10]  Beltran filed a counterclaim seeking enforcement of the order under § 153(p), which permits any person for whose benefit an order was made to file to enforce the order if the carrier does not comply. 45 U.S.C. § 153(p).

## Standard of Review

This Court may decline to defer to a decision of the Board only if (1) the Board failed to comply with the RLA, (2) there is evidence of fraud or corruption in the Board, or (3) the order by the Board did not "confine itself to matters within the scope of [the Board's] jurisdiction." *Continental Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 555 F.3d 399, 405 (5th Cir. 2009). Absent one of these exclusive statutory grounds, or a judicially created exception for public policy concerns, the award is binding upon the parties. *Id.* at 406.

The standard for this review is "among the narrowest known to the law." *E. Air Lines, Inc. v. Transp. Workers Union*, Local 533, 580 F.2d 169, 172 (5th Cir. 1978).  However, the role of the arbitrator is confined to interpretation and application of the CBA; the arbitrator does not sit to dispense its own brand of industrial justice. *BNSF Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 550 F.3d 418, 425 (5th Cir. 2008) (citing *Steelworkers of Am. V. Enter. Wheel & Car. Corp.*, 363 U.S. 593, 597 (1960)).

Normally, an award is deemed to be within the Board's jurisdiction when it is grounded in the CBA. *Continental Airlines, Inc. v. Int'l Broth. of Teamsters*, 391 F.3d 613, 617 (5th Cir.

---

[10] The Court notes that Beltran previously filed a civil action under the Texas Labor Code against Union Pacific in Texas state court on October 23, 2015, and Union Pacific removed the case to this court on diversity grounds.  The Honorable Robert Pitman granted summary judgment for Union Pacific on February 21, 2017.  *Beltran v. Union Pacific R. Co.*, No. 5:15-CV-1019-RP, 2017 WL 685582 (W.D. Tex. Feb. 21, 2017).

2004). An arbitration panel exceeds the scope of its jurisdiction if it ignores an explicit term in a CBA. *BNSF Ry.*, 550 F.3d at 425. A last chance agreement is a supplement to the CBA, such that its terms are just as binding on an arbitrator as the CBA, and unambiguous terms may not be ignored. *Air Line Pilots Ass'n*, 555 F.3d at 406. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of its authority, that a court is convinced it committed serious error does not suffice to overturn the decision. *Id.* (quoting *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38 (1987)). The essence of the CBA includes not just its express language but also implied terms and the parties' practice, usage, and custom. *BNSF Ry.*, 550 F.3d at 426.

Under § 153, this Court may affirm the order, or set it aside, in whole or in part, or remand for further action, and may "make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order." 45 U.S.C. § 153.

The parties have stipulated to the factual record, and thus there are no material facts in dispute.

**Analysis**

Union Pacific moves for summary judgment on the basis that the Board acted outside of its jurisdiction, and that the reinstatement order violates public policy. The basis for both arguments is 49 C.F.R. § 40.149(c), which was not raised in the proceedings below. Union Pacific argues that the Board contravened this regulation and thus acted without jurisdiction and contrary to public policy. Union Pacific summarizes the dispute as boiling down to whether the Board had the authority to overturn the MRO's "no false positive" finding given the language of 49 C.F.R. § 40.149(c). Union Pacific argues that it did not, and because the arbitration award is

contrary to the regulation, it must be set aside as outside the arbitrator's jurisdiction and against public policy. Union Pacific seeks a judgment setting aside that part of the arbitration award that orders it to return Beltran to work or, alternatively, remanding this matter to the Board to revise its conclusions and findings.

Beltran argues that Union Pacific waived its argument by not citing the regulation until this proceeding, and by agreeing that the arbitrator could determine whether the drug test proved a violation of the Drug & Alcohol Policy. Beltran argues that the Board did exactly as it was intended and authorized to do – evaluate the evidence and determine whether Beltran's positive test result was valid. Beltran further argues that the reinstatement order here does not violate public policy because it is conditioned on Beltran's adherence to return-to-work processes ensuring safety. Beltran notes that the regulations themselves do not require termination, and if the employee can be returned to work within a treatment program and drug testing protocol, there is no public policy violation.

Beltran further cites to DOT interpretive guidance for § 40.149 and § 40.209 (outlining which procedural problems must be noted but do not result in cancellation of a test), which answers the question "What is an employer to do if an arbitrator's decision claims to overturn the result of a DOT drug or alcohol test on grounds contrary to DOT regulations?" The answer is:

> There could be instances in which an arbitrator makes a decision that purports to cancel a DOT test for reasons that the DOT regulation does not recognize as valid.

> For example, the arbitrator might make a decision based on disagreement with an MRO's judgment about a legitimate medical explanation (see § 40.149) or on the basis of a procedural error that is not sufficient to cancel a test (see § 40.209).

> Such a test result remains valid under DOT regulations, notwithstanding the arbitrator's decision. Consequently, as a matter of Federal safety regulation, the

employer must not return the employee to the performance of safety-sensitive functions until the employee has completed the return to duty process.

The employer may still be bound to implement the personnel policy outcome of the arbitrator's decision in such a case. This can result in hardship for the employer (e.g., being required to pay an individual at the same time as the Department's rules prevent the individual from performing the duties of his job.)

Beltran argues that this guidance preserves the MRO's authority in directing that the test result remains valid under DOT regulations (and supports public policy by ensuring application of federal safety regulations), while also preserving the arbitrator's authority to conduct its review and make personnel decisions. Beltran contends that the Board could reinstate him even though it improperly changed the test result, as long as it ensured that safety precautions were taken.

As noted, the UPRR Drug & Alcohol Policy 21.1.2 provides, "An employee who has been granted a one-time return to service under this provision and who violates the Union Pacific Drug and Alcohol Policy again within a ten (10) year period will be dismissed permanently." Thus, Union Pacific had to show that Beltran violated the UPRR Drug & Alcohol policy when he tested positive the second time. Union Pacific is essentially arguing that the positive drug test is conclusive proof of the violation under the circumstances because the Board could not change the positive test result, and thus the arbitrator acted outside its jurisdiction in reinstating Beltran rather than dismissing him.

The scheme established by the regulations, the UPRR Drug & Alcohol Policy, and the Waiver/Agreement Letter indicate that an MRO-verified positive drug test result is not always a violation of the Drug & Alcohol Policy. Although a positive test result, standing alone, requires the employee to be suspended from regulated service for safety reasons,[11] the regulations, the

---

[11] *E.g.*, 49 C.F.R. 40.23(a) ("As an employer who receives a verified positive drug test result, you must immediately remove the employee involved from performing safety-sensitive functions."); 49 C.F.R. § 382.215 ("No driver shall

Drug & Alcohol Policy, and the Waiver/Agreement Letter contemplate that the employee may contest the validity of a positive test result and have a hearing to determine whether there was in fact a violation of the Drug & Alcohol policy or regulation.  For example:

- The Waiver/Letter Agreement states that, if Beltran "den[ies] the validity" of a test result conducted under UPRR or federal authority, he may petition for a hearing under 49 C.F.R. 219.104.  R. 117.

- UPRR Drug & Alcohol Policy 5.5.1 states, "If the railroad determines that an employee has violated 49 CFR Parts 219.101 or 219.102, or the alcohol or controlled substances misuse rule of another DOT agency, the railroad must immediately remove the employee from covered service.  If the employee denies in writing that the test result is valid evidence of alcohol or drug use prohibited by 49 CFR Part 219 (including refusals), the employee may demand and must be provided an opportunity for a prompt post-suspension hearing before a presiding officer other than the charging official."

- UPRR Drug & Alcohol Policy 21.1.2 states, "An employee may petition and receive a Redress Hearing as provided in [49 U.S.C. § 20165[12]] to review his or her specimen test results that were determined to be in violation of the Drug and Alcohol Policy as a result of a non-Federal authority test."

- 49 C.F.R. § 219.104 states that "if a regulated employee denies that a test result or other information is valid evidence of a § 219.101 or § 219.102 violation, the

---

report for duty, remain on duty or perform a safety-sensitive function, if the driver tests positive . . . for controlled substances.  No employer having knowledge that a driver has tested positive . . . for controlled substances shall permit the driver to perform or continue to perform safety-sensitive functions."); 49 C.F.R. § 382.217 ("No employer may allow, require, permit or authorize a driver to operate a commercial motor vehicle during any period in which an employer determines that a driver is not in compliance with the return-to-duty requirements in 49 CFR part 40, subpart O, after the occurrence of any of the following events: (a) The driver receives a positive, adulterated, or substituted drug test result conducted under part 40 of this title.").

[12] This statute provides:

> Each railroad carrier that has a non-Federal alcohol and drug testing program must provide a redress process to its employees who are subject to both the alcohol and drug testing program and chapter 211 of this title for such an employee to petition for and receive a carrier hearing to review his or her specimen test results that were determined to be in violation of the program.  A dispute or grievance raised by a railroad carrier or its employee, except a probationary employee, in connection with the carrier's alcohol and drug testing program and the application of this section is subject to resolution under section 3 of the Railway Labor Act (45 U.S.C. 153).

When the employee is in the 12-month probationary period, a positive drug test is a violation and no hearing is allowed.  *See* Waiver/Agreement Letter ("Failure to comply with these conditions and/or the terms and conditions of the Companion Agreement during the 12-month probationary period will result in your immediate return to dismissed status without benefit of a formal hearing, under your collective bargaining agreement.").

regulated employee may demand and must be provided an opportunity for a prompt post-suspension hearing before a presiding officer other than the charging officer" and "the presiding officer must make separate findings as to compliance with §§ 219.101 and 219.102."

The UPRR Drug & Alcohol Policy section 17 further indicates that an MRO-verified positive drug test is evidence of a violation, requiring immediate withdrawal from service, but is not conclusive of a violation of the Drug & Alcohol Policy. That section, entitled "Removal From Service and Discipline," provides:

> 17.1 Withheld from service: If Union Pacific determines there is *reason to believe that an employee has violated this drug and alcohol policy, as evidenced by a verified positive drug test result reported by the MRO*, or based on a positive alcohol test or observation of pre-duty use or on-duty use or possession or other verifiable reasons (e.g., criminal conviction related to drugs), the employee will immediately be withheld from service, pending disciplinary action.
>
> 17.2 Dismissal: If it is determined that an employee violated this drug and alcohol policy the employee will be subject to discipline, up to and including dismissal.

R. 163 (emphasis added).

Thus, when the employee and the Carrier disagree about whether an MRO-verified positive test result is valid evidence of a drug policy violation, the employee may have a hearing and the matter may be submitted to arbitration.[13]

The cases bear this out. In *Atchison, Topeka & Santa Fe Ry. Co. v. United Transportation Union*, 175 F.3d 355 (5th Cir. 1999), the employee was fired for testing positive for controlled substances twice within ten years. The matter was submitted to arbitration, and the board found that the MRO had not investigated the effect that the employee's medications might have had on the drug test result and "thus that the November 1993 positive test result was

---

[13] This is in contrast to certain other provisions addressing the effects of positive drug test results, such as UPRR Drug & Alcohol Policy 23.3.1: "A positive result on a Follow-Up test, or any other drug or alcohol test administered during the 'probationary period' is a violation of the terms of the probation."

not a valid ground for firing Richardson." *Id.* at 357. Santa Fe Railway appealed, arguing that the Board exceeded its jurisdiction because there was no evidence that the medications could have caused a false positive result. The Court rejected that argument, noting that the "Board's finding was that Santa Fe failed to have its MRO investigate Richardson's medications. Because of that failure, the Board held, the positive test result could not be considered valid. The Board's factually based findings in this regard are conclusive," and without a valid test result there was no ground for dismissing the employee under the CBA. *Id.* at 357-58. However, this case does not mention or consider 49 C.F.R. § 40.149(c), and rather than expressly disagreeing with the MRO's conclusion that the test result was not a false positive, the Board relied upon the MRO's violation of the regulatory requirement to investigate the employee's medications to find that the positive result could not be considered valid.

The Ninth Circuit has similarly held that an arbitrator may decide that a verified positive drug test is not valid evidence of a drug policy violation when the drug test is not conducted under the required procedures. In *Southern California Gas Co. v. Utility Workers Union of America*, 265 F.3d 787 (9th Cir. 2001), after the MRO verified a positive drug test result to the employer, it was revealed that the MRO was not a licensed physician and thus was not a qualified MRO. Another MRO then reviewed and verified the earlier test results. The arbitrator found that the employer failed to comply with the DOT drug testing regulations, which required the MRO to verify the positive test results *before* disciplinary action was taken, and reinstated the employee. The Court held that the relevant issue was not whether the employee had in fact taken prohibited drugs, but whether the drug test was properly administered so as to justify the termination. The Court and arbitrator specifically relied on a regulation that provided that failing a drug test means that the confirmation test result shows positive evidence of the presence *under*

17

*DOT procedures* of a prohibited drug in the employee's system, and thus the issue for the arbitrator was not a factual finding regarding drug use but whether the employer followed DOT procedures in testing the employees before it discharged them.

The Court emphasized the arbitrator's reading of the plain and unambiguous language of the regulations governing MRO review, which required certification of a positive test by a licensed physician (MRO) *before* the company is told and therefore before discipline is imposed. *Id.* at 793-94. The Court also emphasized the standard of review that courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Id.* at 794. The Court also rejected the company's public policy arguments, asserting that the issue was whether public policy prohibited reinstatement of employees whose drug tests did not comport with DOT regulations, not whether it prohibited reinstatement of employees who tested positive. *Id.* at 796.

A district court opinion further confirms that the arbitrator may invalidate a verified positive result on certain procedural grounds. In *BNSF Railway Company v. Brotherhood of Locomotive Engineers and Trainmen*, 524 F. Supp. 2d 818 (N.D. Tex. 2007), the employee was found guilty of the charge that she submitted a substituted or adulterated urine sample (the functional equivalent of refusing to submit a sample) and was terminated. The Board chose not to make a ruling on the merits of the charge, but instead ruled in the employee's favor on her procedural argument that BNSF violated a rule in the CBA that the investigation be fair and impartial because it had the same individual file the charges, conduct the hearing, develop evidence, pass judgment, and impose penalty. The employee was therefore reinstated. The Carrier members of the Board dissented, arguing that the award was contrary to public policy and had no basis in reason or fact.

18

The district court found that "the fact of adulteration or substitution of the urine sample is established without genuine dispute in the record of the hearing," that "no rational Board could have failed to find from the record that [the employee's] urine was adulterated," and that "the Board would have exceeded its jurisdiction if it had found otherwise." *Id.* at 824. But the district court held that the Board's decision not to address the merits and base its award on other grounds was within its jurisdiction because the CBA expressly required a fair and impartial investigation. Thus, unless public policy dictated otherwise, the Board had authority to reinstate an employee who was dismissed in violation of this clear directive. *Id.* at 825. However, reviewing the applicable regulations, which required a period of disqualification of nine months following a positive drug test, completion of a program of counseling or treatment, and negative drug tests, the district court found that the reinstatement award frustrated the regulatory requirements and remanded for the Board to "take action consist with this opinion" such as including "an appropriate disqualification period and a requirement that she should participate in an appropriate substance abuse treatment and monitoring plan." *Id.* at 827-28.

These cases support the conclusion that an arbitration panel may generally determine whether an MRO-verified positive test result is valid evidence of a drug policy violation and may invalidate the results on various procedural grounds, and the Court's review of such a determination is limited. The parties generally agree with this, but Beltran essentially argues that the Board can invalidate the results on any ground, even if prohibited by the regulations, so long as safety regulations are followed, while Union Pacific argues that the Board's decision cannot violate the regulatory scheme. Although the cases provided some guidance, they do not answer the precise question presented here, which is whether the Board exceeded its jurisdiction when it essentially found that the test result was a false positive based on information provided by the

employee after the verification interview, when the MRO declined to change the verified positive result, and when the regulations expressly preclude the Board from doing so.

The Board's decision rests on Beltran's failure to inform testing personnel of his medications, and essentially finds that the medications resulted in a false positive. But, as discussed above, the regulations provide that the employee has the burden of coming forward with a legitimate medical explanation for an amphetamine result *and* must do so *at the time of the verification interview*. 49 C.F.R. § 40.137 ("The employee has the burden of proof that a legitimate medical explanation exists. The employee must present information meeting this burden at the time of the verification interview."). The regulations provide that only the MRO can change a verified positive result and set forth the conditions for doing so, which include receipt within 60 days of "information that could not reasonably have been provided to [the MRO] at the time of the decision demonstrating that there is a legitimate medical explanation for the presence of drug(s)/metabolite(s) in the employee's specimen" or "credible new or additional evidence that a legitimate medical explanation for an adulterated or substituted result exists." 49 C.F.R. § 40.149. Regardless of the circumstances, *only* the MRO – not the arbitrator – may change the verified positive result. 49 C.F.R. § 40.149(c). The regulations recognize that the arbitrator is not qualified to confirm or reject the presence of prohibited drugs in a urine sample because that is a medical judgment. *S. Ca. Gas Co.*, 265 F.3d at 793 (9th Cir. 2001) (noting that the arbitrator is not qualified under DOT regulations to confirm the presence of prohibited drugs from a urine sample).

The Board found no procedural or regulatory violations by Union Pacific or the MRO. Instead, the Board's order relieved Beltran of his burden to provide information at the verification interview and essentially changed the verified positive test result to a false positive

based on information provided by Beltran at the hearing/arbitration, even in the face of Dr. Barnett's refusal to change his verification, all in direct contravention of the regulatory scheme. The Fifth Circuit has emphasized that the Court "must defer to the [Board's] decision if it may be supported by any analysis of the LCA and CBA, whether or not relied on by the [Board], that 'arguably construes' those agreements" and that "[e]ven if the chain of reasoning is not correct, and the [Board's] decision appears to us to be a serious error, we must defer as long as no step in the reasoning process ignores an unambiguous provision of the LCA and CBA." *ALPA*, 555 F.3d at 406. However, this case falls into that narrow category of cases in which the Court cannot defer because the underlying reasoning contravenes the unambiguous regulatory language.

The Board made a fact finding that the regulations expressly preclude the Board from making and therefore acted outside its authority.[14] Because the Board provided no other reason for finding that Beltran did not violate the UPRR Drug & Alcohol Policy, the Board acted without a basis in fact and therefore outside its authority in ordering reinstatement. Unlike *Atchison, Topeka* and *Southern California Gas Co.*, the arbitrator is not enforcing regulatory requirements in reaching its conclusion, but expressly contravening them.

In *Airline Pilots Association*, the Fifth Circuit held that the arbitration board's "requirement that [the employee] participate in the EAP program for two years cannot be the result of an arguable construction of the LCA and CBA" when the regulations clearly state that only an accredited Substance Abuse Professional could determine the length of program

---

[14] It is well settled that the Court may not reject the Board's fact findings simply because it disagrees with them. *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38 (1987). In finding that the Board lacked authority to make this fact finding, the Court is not concerned with the merits of the finding or whether it is right or wrong; it is concerned only with the fact that 49 C.F.R. § 40.149(c), which is expressly incorporated into the UPRR Drug & Alcohol Policy, precludes the Board from making such a finding.

participation. 555 F.3d at 412. The Court noted the clear regulatory language of 49 C.F.R. § 40.297(a) vesting "sole discretion in a Department of Transportation ('DOT') accredited Substance Abuse Professional ('SAP') to make treatment evaluations of, or recommendations for assistance about, an employee who has violated DOT drug and alcohol regulations." That regulation states in relevant part: "[N]o one (e.g., an employer, employee, a managed-care provider, any service agent) may change in any way the SAP's evaluation or recommendations for assistance. For example, a third party is not permitted to make more or less stringent a SAP's recommendation by changing the SAP's evaluation or seeking another SAP's evaluation." Thus, the board's requirement that the employee participate in the EAP program for two years "cannot be the result of an arguable construction of the LCA and CBA." *Id.* at 412. The Court concluded, "We hold that by vesting the EAP director with the discretion to prescribe [the employee's] course of treatment, the CBA and LCA cannot be construed to vest that power in the SBA." *Id.* at 414. Similarly, the Board's decision in this case cannot be the result of an arguable construction of the LCA and CBA when it directly contravenes the regulations.

In addition, because the Board's decision directly contravenes a governing regulation, it violates public policy. *See id.* ("to permit the SBA to order McWhirter to participate in the EAP for two more years . . . regardless of the SAP's professional opinion—comes so close to directly contravening a controlling federal air-safety regulation that, if such a decision were not outside of the SBA's jurisdiction, it would be a violation of public policy"). Beltran is correct that the Supreme Court held in *Eastern Associated Coal Corporation v. United Mine Workers of America*, 531 U.S. 57 (2000) that a board's order reinstating an employee to a safety-sensitive position after the employee twice tested positive for marijuana did not violate public policy because the governing regulatory regime did not "forbid an employer to reinstate in a safety-

sensitive position an employee who fails a random drug test once or twice" and the reinstatement was "consistent with DOT rules requiring completion of substance-abuse treatment before returning to work." *Id.* at 65-66.  But the Supreme Court was clear that "[t]he award violates no specific provision of any law or regulation."  *Id.* at 66.

Here, in contrast, the award does violate a specific regulation, and thus the Court agrees with Union Pacific that it is more like the situation in *Airline Pilots Association*, 555 F.3d at 421. The Fifth Circuit held that the public policy rationale for vacating the condition was strong because it perceived an "explicit" and "defined" policy against interference with the professional discretion of the SAP in 49 C.F.R. § 40.297(a), justified by the need for objective and professional treatment of substance abuse in safety-sensitive employees, that extends beyond the literal terms of the regulation. *Id.*  It further noted, "Section 40.297(a) says as clearly as it can that only a SAP may have anything to do with the substance abuse assistance recommended for a safety-sensitive employee." *Id.*  Similarly, § 40.149(c) states as clearly as it can that only the MRO can determine whether a legitimate medical explanation exists for a positive drug test result, and expressly forbids the arbitrator from making a contrary finding.  This is a clear public policy against interference with the medical judgment of the MRO by those lacking appropriate medical expertise.[15]

Beltran contends that the DOT's official guidance "makes clear that the arbitral board may disagree with the MRO and reinstate an employee, as long as the reinstatement is conditioned on the individual's adherence to the Department's return to work processes."

---

[15] Beltran argues that the award does not violate public policy because none of the conditions of reinstatement directly violate a regulation, as in *Airline Pilots Association*.  *E.g.*, Docket no. 21-1 at 27 n.10.  The Court is not convinced by this argument, given that the Board's fact finding, which is the only support for its reinstatement decision, directly violates a regulation.

Docket no. 21-1 at 17. But the official guidance does not condone the Board's action in contravening the regulation, alter the express language of the regulation, or express a public policy in favor of allowing arbitrators to contravene the MRO's medical judgment.[16] Rather, it makes clear that when an arbitrator errantly does so, the test results remains positive for regulatory safety requirements, and the employer must comply with those requirements despite the Board's actions. And the language that "[t]he employer may still be bound to implement the personnel policy outcome of the arbitrator's decision in such a case" and that "[t]his can result in hardship for the employer (e.g., being required to pay an individual at the same time as the Department's rules prevent the individual from performing the duties of his job)" does not indicate the Department's support for enforcing an award requiring the employer to reinstate an employee when the terms of the governing agreement would mandate dismissal. Rather, it acknowledges that, in some circumstances, the employer may nevertheless be bound to implement the arbitrator's decision regardless of the fact that it violates the regulation. If the employer chooses to challenge the arbitrator's decision, as Union Pacific has done here, the interpretive guidance does not prevent a court from finding that the arbitrator exceeded its jurisdiction or violated public policy.

The Court further agrees with Union Pacific that its failure to raise the regulation before the Board does not amount to a waiver that precludes it from raising it here on the basis of public policy. In *Gulf Coast Industrial Workers Union v. Exxon Co., USA*, 991 F.2d 244, 248 n.5 (5th Cir. 1993), the Fifth Circuit rejected the Union's argument that "Exxon somehow waived its

---

[16] In fact, as Union Pacific points out, the guidance also answers the question "Can arbitrators change or overturn the MRO's determination about the verification of a test result," and answers, "No. The MRO is the only person authorized to change a verified test result" and "[t]he arbitrator could not overturn a decision of the MRO concerning a test verification any more than the employer could on its own." Docket no. 22 at 5 (citing Part 40 Questions and Answers (Sept. 2001)).

public policy argument by agreeing to arbitration and/or by not advancing it before the arbitrator" because "[u]nder the terms of the collective bargaining agreement, the company had no choice but to arbitrate the grievance after earlier proceedings were exhausted" and "[i]n any event, courts are the ultimate arbiters of public policy, not arbitrators." Beltran concedes that *Gulf Coast* is controlling precedent from the Fifth Circuit, but argues that it is distinguishable because the basis for the public policy argument was not part of the underlying CBA, whereas here the regulation at issue was expressly incorporated into the Drug & Alcohol Policy and thus should have been presented to the Board as part of Union Pacific's argument that the positive drug test result was valid evidence of a drug policy violation.[17]

While this argument may have some persuasive force concerning whether Union Pacific waived its argument that the Board acted outside its jurisdiction (which the Court need not decide), it does not amount to waiver of the public policy argument. Here, Union Pacific was obligated to arbitrate whether the positive drug test result was valid evidence of a Drug & Alcohol Policy violation; thus its agreement to submit this issue to the arbitrator does not amount to waiver concerning whether the evidence was sufficient to prove a violation. Though the failure to raise the specific regulation during the arbitration is regrettable, the Board's decision clearly violates the regulation and public policy, and as emphasized by the Fifth Circuit in *Gulf Coast*, public policy is for the Court, not the arbitrator. Although the Board can broadly determine whether a verified positive drug test result is valid evidence of a drug policy violation,

---

[17] Beltran argues that, unlike *Gulf Coast*, "the policy here could and should have been raised in arbitration and the failure to raise it below is properly analyzed under the waiver analysis," citing *International Association of Bridge, Structural & Reinforcing Iron Workers Union Local #7 v. Associated General Contractors of Massachusetts*, 489 F.3d 75, 79 n.3 (1st Cir. 2007). However, that case actually states, "Some courts have found public policy claims not raised before an arbitrator to have been waived; *one circuit disagrees*. The matter may turn on the nature of the public policy and whether it makes sense for the arbitrator to consider the objection in the first instance." *Id.* (emphasis added) (citations omitted). The circuit that disagrees is the Fifth Circuit.

in making that determination, neither the Board nor the employer can change the MRO's determination that no legitimate medical explanation exists for the positive result, yet that is precisely what the Board did here, and that violates a clear and express policy that only an MRO with appropriate medical expertise can make this determination.  An award that violates public policy should not be enforced, regardless of whether the arbitrator was made aware of the issue.

## Conclusion

The Board was tasked with determining whether Beltran's positive drug test result was valid evidence of a Drug & Alcohol Policy violation.  If it was, the LCA and CBA required dismissal.  In exercising its jurisdiction to make this determination, the Board violated a regulation that expressly carves out from the arbitrator's fact-finding jurisdiction the issue of whether there is a legitimate medical explanation for the positive result, and it relieved the employee of his burden of proof obligations under the regulations.  It is undisputed that the Board essentially converted the MRO's verified positive drug test result into a false positive (*i.e.*, negative) test result and based its reinstatement decision solely on the fact that it believed the drug test to be a false positive based on evidence provided by Beltran after the verification process.[18]  Thus, the Board acted outside its jurisdiction and contrary to public policy.  Because the award in dispute here violates explicit, well-defined public policy, it must be set aside.

---

[18] Docket no. 19-1 at 6 ("The PLB implicitly overturned MRO Dr. Barnett's conclusion that there was no legitimate explanation for Beltran's positive test result."); Docket no. 21-1 at 27 ("the PLB exercised its power to disagree with the MRO").

Union Pacific's motion for summary judgment (docket no. 19) is GRANTED, Beltran's

motion (docket no. 21) is DENIED, and the Board's award is VACATED.

It is so ORDERED.

SIGNED this 26th day of January, 2018.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE